IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | CRIMINAL NO. |
| | ) | 12-210-CB-B |
| DERRICK LASHON SIMMONS, | ) | |
| | ) | |
| Defendant | ) | |

**OPINION and ORDER**

On July 29, 2103, this matter came before the Court for a hearing on Defendant's motion to suppress evidence (Doc. 34). After considering the evidence presented in light of the applicable law, the Court finds that the motion is due to be granted.

**Facts**

The search at issue took place on May 15, 2013 when the United States Marshal's Service (USMS) arrested the defendant, Derrick Lashon Simmons, on warrant issued pursuant to the original indictment in this case. The single-defendant indictment, which was returned on September 16, 2012, charged three counts: (1) intent to distribute 6.24 grams of crack cocaine (Count One), (2) possession of a firearm during and in relation to a drug trafficking crime (Count Two), and (3) possession of a firearm (the same firearm charged in Count Two) after having previously been convicted of a crime punishable by more than one year (i.e., a conviction for possession of cocaine on or about May 2, 2000).[1]

---

[1] The indictment has been superseded twice. Counts One, Two, and Three are now Counts Two, Three, and Four in the Second Superseding Indictment.

The arrest took place at the Defendant's residence in Prichard, Alabama. Between 7:30 and 8:00 a.m., six to eight members of the USMS Gulf Coast Regional Fugitive Task Force ("the Task Force") arrived at the residence with arrest warrant in hand. The Task Force officers arrived in approximately four cars and parked in the driveway near the back door of the residence and on the street nearby. Deputy USM Henry Geberth, the Task Force supervisor, knew the charges in the indictment and also was aware that the Defendant was known to possess firearms. Geberth and others went to the back door of the residence, which was the main entrance, while other deputies were stationed at the front door and at the perimeter. All of the Task Force members were armed with side arms, and some carried long guns.

The back door, which led into the kitchen, was protected by a security door. The deputies either rang the doorbell or knocked at the back door. Simmons asked, "Who is it?" The deputies announced themselves. Simmons, who was wearing a t-shirt and boxers, opened the back door (the security door remained closed)[2] and either said, "Hang on a minute" or "Let me get the key." Then he closed the door. The deputies could hear movement inside and began to shout for Simmons to open the door and also began to shout for breaching equipment so that they could force the door open.[3] They were prepared to "set a pick" to pry open the security door, but the Defendant opened the back door again, unlocked the security door, stepped outside onto the stoop and was taken into custody. About 45 seconds elapsed from the time Simmons first opened and closed the door until the time he unlocked the

---

[2] Deputies could smell burning marijuana when Simmons first opened the door.

[3] Due to oversight, the officers had left the battering ram and other tools necessary to force open the door in their vehicles.

door and stepped outside.  After Simmons came out and was arrested, deputies continued to shout for anyone in the residence to come out.  Simmons' girlfriend Tameka Jones came out of the house after Simmons was handcuffed.

After Jones came out, deputies went into the house and conducted a room-to-room search to see if anyone else was inside.  They looked inside closets and under beds.  They also flipped mattresses in each bedroom to look between the mattress and box springs.  In a downstairs bedroom, Deputy USM Bartel found a revolver, a derringer, between the mattress and box springs.

At the suppression hearing, Supervisor Geberth and Deputy Bartel explained that the search was conducted for the safety and protection of the officers on the scene.  They pointed out that the Task Force usually stays on the scene for a time following an arrest while waiting for the Mobile Police Department (MPD) or Mobile County Sheriff's Office (MCSO) to send a car to transport the arrestee to jail.  Providing transportation for arrestees is a service that MPD and MCSO provides when they can, although many times they cannot.  When no patrol car is available, the Task Force transports the arrestee.[4]  It is possible that someone could launch an attack from inside a residence, while task force members wait outside for a patrol car.  While they wait, the Task Force members complete paperwork.  In this instance, the Task Force called the MCSO for transport, but subsequently learned there would be a delay because the patrol cars were tied up.  After about 10 to 15 minutes on the scene, the Task Force officers transported Simmons themselves.

---

[4] According to Deputy Bartel, the task force prefers to wait for a patrol car because it provides more security for transport and because the task force "as specially trained entry team members," the task force does not want to spend its time transporting people to jail.

Geberth testified that Simmons' act of retreating back into the house made the deputies concerned for their safety. He also noted what he called a "long delay" in responding to deputies' commands. Geberth explained the rationale as follows:

> It was the long delay, especially in this particular case when there was commotion going on inside the residence and we were trying to –we were giving the suspect lawful commands to enter – to open the door to come to the door and come outside of the residence to be taken into custody. It is very typical in our –when we arrest somebody that there are – have been on occasion there are other people hiding in the residence that could have – could harm us and based upon our experience conducting operations here and nationwide, it's taught –

(Tr. 13.[5])

Deputy Bartel explained that mattresses were turned over to look for individuals who might be hiding between the mattress and box springs. He testified that in the past people had been found hiding between mattresses and box springs. He also testified that the Task Force once found someone inside a box spring that had a hiding place cut out. According to Bartel, it was not possible to tell whether someone was underneath the mattress where the revolver was found without turning it over because the bed was unmade and the room was very messy.

**Legal Analysis**

"The Fourth Amendment to the United States Constitution guarantees '[t]he right of the people to be secure in their persons houses papers and effects against unreasonable search and seizure.'" *Sammons v. Taylor*, 967 F.2d 1533 (11th Cir. 1992) (quoting U.S. Const. amend. IV). In *Maryland v. Buie*, 494 U.S. 325 (1990), the Supreme Court held that the Fourth Amendment permits police officers to conduct a

---

[5] The Court has obtained an unofficial transcript from the court reporter for use in this order.

4

"protective sweep" which it defined as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Id.* at 327. The Court defined two situations in which a protective sweep is justified: (1) "as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched;" (2) "[b]eyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 334.

Because Simmons was arrested outside his house, this case involves the second *Buie* scenario. *See United States v. Scott*, 2013 WL 1558237 (11th Cir. April 17, 2013) (unpublished table decision) (where defendant arrested outside home "subsequent protective sweep of his home was not justified under *Buie* absent reasonable suspicion that there were dangerous individuals in the home"). Consequently, the Court must determine whether the government has presented facts sufficient to create a reasonable suspicion that a person posing danger to them was: (1) inside the residence and (2) hiding between the mattress and box springs.

### *Justification for Entering the Residence*

Deputy Geberth testified that he suspected someone was in the house because Simmons "retreated" after he opened the door, deputies heard movement inside the house after the defendant retreated, and there was a "long delay" before Simmons returned to the door even though deputies were giving "lawful commands

5

to enter." In addition, Deputy Geberth was concerned about officer safety because Simmons was indicted for guns and drugs and was known to possess firearms. An added safety concern was the deputies' vulnerability to attack from unknown persons inside the house while they remained outside waiting for a patrol car to transport the prisoner. None of these justifications, either alone or together, provides reasonable suspicion that a dangerous person was inside the house.[6]

First, Simmons' "retreat" lasted only 45 seconds, which can hardly be characterized as a "long delay."[7] After he returned to the back door, unlocked the security door, stepped outside and was arrested, whatever suspicion may have been

---

[6] The government cites several cases to support its claim that the facts in this case created a reasonable suspicion. Several of those cases are pre-*Buie,* however, and should not be considered for that reason alone. The cases that do apply *Buie* are distinguishable, primarily because the officers cited more substantial facts to justify their suspicion or because the case did not involve the second type of *Buie* search. *See, e.g., e.g., United States v. Wright*, 324 Fed. Appx. 300 (11th Cir. April 24, 2009) (unpublished) (search of kitchen area permissible when suspect arrested outside was taken into kitchen to get a shirt); *United States v. Kimmons*, 965 F.2d 1001 (11th Cir. 1992) (police thwarted robbery, arrested three suspects in quick succession and knew that a fourth suspect remained at large), *vacated sub nom. Small v. United States*, 508 U.S. 92 (1993); *United States v. Tobin*, 923 F.2d 1506 (11th Cir. 1991) (defendant lied to officers about the presence of a second individual and there were more vehicles than people at the residence). At the hearing, the government did elicit testimony that there were three vehicles in Simmons' driveway. However, there was no evidence that this fact caused the deputies to suspect an additional person might be inside the house. Moreover, the presence of three vehicles, without more, does not give rise to a reasonable suspicion that more than two people are present.

[7] Even if it were, the government has not explained how that fact would lead to the conclusion that another person was inside the house. In his testimony, Deputy Geberth alluded to "typical" experience, to training, and to other instances nationwide but never connected this general experience, training and knowledge to a reasonable suspicion that another person (in addition to Simmons and his girlfriend) actually was in the residence at the time.

6

caused by his retreat was dispelled.[8]  The movement the deputies heard inside the house occurred in the 45-second interval after Simmons closed the door and before he came back and opened the security door.  After Simmons came out, Tameka Jones also came outside, and there was no evidence that any movement was heard from inside after that point.  This evidence—brief retreat, movement from inside, followed by the exit of two persons from the residence—does not justify the assumption that other people remained inside.  *See United States v. Archibald* 589 F.3d 289, 300-01 (6th Cir. 2009) (officers could not know from hearing movement inside prior to arrest whether more than one person was inside).[9]

To the extent that the government relies on the danger posed by the situation to justify the search, that reliance is misplaced.  The charges against the Defendant cannot provide the basis for reasonable suspicion to conduct a protective sweep after the Defendant has been taken into custody and no longer poses a danger.  *See United States v. Colbert*, 76 F.3d 773, 777 (6th Cir. 1996) ("[defendant's] dangerousness is not germane to the inquiry into whether the police may conduct a protective sweep in response to a reasonable suspicion of a threat from some *other person* inside the home"). Likewise, generalizations about dangers posed by certain types of criminals are insufficient to support a protective sweep.  *United States v. Moran Vargas*, 376 F.3d 112, 115-16 (2nd Cir. 2008) (finding that link between drug

---

[8] The government never explained why a suspect retreating from law enforcement officers at his door gives rise to a suspicion that someone else is inside the house with the defendant.

[9] In fact, when questioned by the Court, Deputy Geberth admitted that the conclusion he drew from the 45-second "retreat" was that "we didn't know if there w[ere]" more people inside.  (Tr. 23.)  As discussed *infra* at 9, lack of knowledge does not equal articulable facts.  *See United States v. Chaves*, 169 F.3d 687 (11th Cir. 1999).

courier meetings and motel rooms and between drug traffickers and guns did not provide reasonable suspicion that a dangerous person was hiding in the motel room of suspected drug courier).

The government has placed particular emphasis on the danger this arrest situation posed to the officers. The risk of danger to law enforcement at the arrest scene does not provide reasonable suspicion that a person is lurking inside the residence. Otherwise, *Buie* would be rendered meaningless because every potentially dangerous arrest would justify a protective sweep. Furthermore, officers' "perceived vulnerability" does not demonstrate a specific and reasonable belief that other persons are present and pose a danger. *United States v. Archibald*, 589 F.3d 289, 299-300 (6th Cir. 2009). This is especially true where the danger can be avoided or mitigated. *Id.* (if inability to see down hallway from inside front door posed danger, prudent course of action would have been to back away, not proceed through the door).

In this case, the deputies testified that they were vulnerable to attack *after* the arrest as they waited for a patrol car to transport the suspect. According to *Buie,* a protective sweep should last "no longer than it takes to complete the arrest and depart the premises." *Buie,* 494 U.S. at 335. To reduce their vulnerability to attack from inside the house, the deputies could have used their considerable force (six to eight officers armed with side arms and long arms) to provide cover while they loaded Simmons into one of their cars and departed. The evidence established that

it was their choice to wait on the premises for a patrol car when they easily could have transported the Defendant from the scene themselves.[10]

### *Justification for Checking Under the Mattress*

Even if the deputies could demonstrate a reasonable suspicion that someone was inside the house, the search exceeded the permissible scope of a protective sweep. *Buie* limits the search "to a cursory visual inspection of those places in which a person might be hiding." *Id.* And the officers must articulate facts that would warrant a reasonable inference that someone is, in fact, hiding in the area searched. *United States v. Blue*, 78 F.3d 56, 61 (2nd Cir. 1996). Deputy Bartel gave two reasons for suspecting that someone might be hiding between the mattress and the box springs. The first was that individuals had done so in the past. However, the fact that someone had hidden under a mattress in the past does not give rise to a reasonable suspicion that a person is presently hiding underneath a mattress. Bartel's second reason, by implication, was that he could not eliminate the possibility that someone was under the mattress. As he put, "it would have been hard to tell if someone was underneath the mattress" because the bed was unmade and the covers in disarray. But the absence of information does not amount to an articulable basis to justify a protective sweep. *United States v. Chaves*, 169 F3d 687

---

[10]As Deputy Bartel testified, using the MCSO or MPD to transport was, in part, a matter of convenience because it freed the Task Force to concentrate on other matters. While the patrol car was also a safer method of transporting arrestees, it was not always available. Consequently, the Task Force members sometimes had to do the transporting themselves and undertook the degree of risk inherent in transporting an arrestee in an unmarked vehicle. If the risk of danger at the scene was high, transporting the Simmons from the scene immediately would have been the logical choice.

(11th Cir. 1999); *accord Archibald*, 76 F.3d at 778 (*Buie* requires articulable facts, not ignorance).

**Conclusion**

For the reasons set forth above, the Court finds that the Defendant's motion to suppress is due to be and hereby is **GRANTED**.

**DONE** this the 30th day of July, 2013.

s/*Charles R. Butler, Jr.*
**Senior United States District Judge**